AFFIDAVIT

I, Lisa Rudnicki, having been duly sworn, depose and state that:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since February, 1996. In that capacity, I investigate violations of the federal firearms statutes and have participated in many investigations relating to the unlawful possession of firearms and ammunition.

2. Based on my training and experience, I am aware that Title 18, United States Code, Section 922(g)(1) makes it a federal offense for any individual who has previously been convicted of a felony offense to possess a firearm or ammunition in or affecting interstate commerce. Having so stated, I make this affidavit in support of a criminal complaint charging **ANTON RISE** with being a felon in possession of a firearm and ammunition in violation of that statute.

3. The statements contained in this affidavit are based on my own investigation, work done by other ATF Agents, and on information provided to me by officers of the Boston Police Department ("BPD"). This affidavit is submitted for the limited purpose of establishing probable cause to believe **RISE** violated

1

18 U.S.C. §922(g)(1), and therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

4. The investigation into **RISE** was initiated in the early morning hours of March 4, 2017 when Detective Gregory Brown of BPD's Special Investigation Unit received a call from a carded, reliable informant with whom Brown had worked for several years. The CI reported that he/she had observed **RISE** to be armed with a loaded firearm at the "Carver," which Brown knew to be a reference to the Carver Den, a nightclub located at 80 Talbot Avenue in Dorchester. The CI also reported that **RISE** might place the firearm in an unknown automobile and stated that **RISE** was wearing a black sweater, blue jeans and brown boots.

5. Detective Brown was familiar with **RISE** and knew that he had a criminal record that precluded him from legally possessing a firearm. Accordingly, he notified Sgt. Det. Jay Broderick of BPD's Youth Violence Strike Force ("YVSF") so that the YVSF could dispatch one or more its units to the area to investigate and see if they could stop **RISE** and determine if he was armed.

6. One of the units dispatched to the scene was an unmarked SUV occupied by YVSF officers Conley, Butler, Noto and Connolly ("the arresting officers"). Before leaving the YVSF, Officer Conley obtained a photo of **RISE**, confirmed that **RISE** was

2

an identified member of the Greenwood Street Gang and had a significant criminal record that included a recent firearms conviction.

7. Conley and his partners took up a surveillance position near the entrance to the Carver Den on Talbot Ave. so they could monitor patrons as they left the club which was now near closing time. Other responding units were also in the area.

8. As the arresting officers were monitoring the door of the Carver Den, they saw YVSF Officer Greg Eunis, who was working a paid detail at the nightclub. They advised Eunis why they were there and Eunis confirmed that **RISE** had come into the club earlier in the evening and had been frisked and wanded upon entering. Eunis also described what **RISE** had been wearing and stated that he believed that **RISE** was still in the club. After confirming that **RISE** was still inside and confirming how he was dressed, Eunis agreed that he would remain near the door so he could signal the arresting officers (who only knew **RISE**'s appearance from booking or other photographs).

9. Thereafter, Eunis notified the arresting officers that **RISE** (wearing a black winter jacket and a light brown knit hat) was leaving the club. As **RISE** came out and moved into the parking lot with a large crowd of other Carver Den patrons, Officers Eunis and Connolly went to the parking lot under the

3

ruse of directing traffic so they could see when and how **RISE** was leaving.

10. **RISE** lingered in the parking lot for 10-15 minutes talking and making contact with various individuals and did not remain under surveillance the entire time. He then moved back towards the entrance to the club where officers watched him get into the front seat of a Honda Odyssey later determined to be displaying a rear license plate bearing Mass. Reg. 445YF6 and being driven by Ebony Lawrence.

11. Lawrence came out of the lot and turned left down Talbot Ave. driving in the direction of Bernard Street (where officers believed there was an address associated with **RISE**'s family). As the Odyssey pulled out, they noted that it was not displaying the front license plate required by Massachusetts law. As they began to follow the Odyssey, they also noted that it was traveling 45-50 miles per hour, well in excess of the applicable speed limit and faster than reasonable under the circumstances.

12. The officers activated their blue lights in order to effect a traffic stop. As the Odyssey pulled to the right in the area of 88 Bernard Street, another YVSF Unit pulled in front of the Odyssey to block it.

13. As their SUV came to a stop, Officers Conley and Connolly got out and approached the front passenger seat where **RISE** was sitting with the window open. Officer Conley (who was the first officer to get to the door) told **RISE** "Boston police, show me your hands" as he opened the car door. Conley then began to frisk **RISE**'s waistline and immediately felt, and then removed, a firearm from **RISE**'s waist. As Conley removed the gun and alerted his fellow officers as to what he had recovered, **RISE** was removed from the car by other officers and placed under arrest.

14. The firearm recovered from **RISE**'s waist was a Ruger Model 26 9mm semiautomatic that was later determined to contain 15 rounds of 9mm ammunition and had an obliterated serial number ("the charged firearm").

15. After, the charged firearm and the 15 rounds of ammunition recovered from it had been processed and placed into evidence, they were sent to the Latent Print Unit of the Boston Police Department, which was unable to recover any latent fingerprints from them.

16. The charged firearm and the 15 rounds of ammunition recovered from it were also sent to BPD's Ballistic Unit where the gun was successfully test fired and the 15 rounds it contained certified to be ammunition. Following that

5

examination, ATF S/A Mattheu Kelsch, who is trained to perform interstate commerce nexus examinations, inspected the charged firearm and the ammunition it contained. S/A Kelsch examined the charged firearm and the 15 rounds of ammunition it contained when recovered, determined they were a "firearm" and "ammunition" for purposes of federal law, and determined that both the firearm and all of the ammunition had been manufactured outside Massachusetts, meaning that they had traveled across state lines or international boundaries prior to being seized in Boston on March 4, 2017.

17. I have reviewed **RISE**'s criminal record as maintained by the Massachusetts Criminal History Systems Board. It reveals, among other things, that **RISE** was convicted in 2011 in Suffolk Superior Court of illegally carrying a firearm and sentenced to 4-8 years in prison. As the sentence demonstrates, this is a crime punishable under Massachusetts law by imprisonment for more than one year.

18. Based on the foregoing, I submit that there is probable cause to believe that, on or about March 4, 2017, **ANTON RISE**, having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did possess, in and affecting commerce, a firearm and ammunition in violation of

Title 18, United States Code, Section 922 (g)(1).

_Lisa A Rudnicki_
LISA RUDNICKI
Special Agent, ATF

Sworn and subscribed to before me this 27 day of April, 2017.

_Marianne B. Bowler, USMJ_
MARIANNE B. BOWLER
U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

7